UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOSHUA D. JONES, individually and on behalf of others similarly situated, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:11-CV-01431-JMS-DKL |
| | ) | |
| C & D TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT C&D TECHNOLOGIES, INC.'s**
**MEMORANDUM IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

## I.       INTRODUCTION

A deal is a deal.  And it ought to be honored — by the parties to the agreement, the courts and the government — especially when the government has expressly authorized such a deal to be made.  Long ago in a decade far, far away the company and the union at the Attica, Indiana plant bargained over the activities at issue in this case and reached an agreement on how they would be handled for purposes of compensation.  The deal was that employees would get a total of 15 minutes a day for pre- and post-shift activities ancillary to the actual production work of making batteries.  These activities include washing up, changing into work clothes and getting to and from their work areas.  The Fair Labor Standards Act specifically authorizes bargaining over these activities.  There is no evidence that either party to the Collective Bargaining Agreement had ever sought in negotiations to change the deal that was struck decades ago.  Now, however, employees at the Attica plant, through counsel, seek to get awarded retroactive pay, liquidated damages, and attorneys' fees for time spent in these pre- and post-shift activities beyond that which was agreed to in the Collective Bargaining Agreement.  Ruling in favor of Plaintiffs

would upend decades-old contractual language, cause labor unrest and weaken, not further, public policy.  The only benefit from such a ruling is a temporary, retroactive financial windfall for employees — and their counsel.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

C&D Technologies, Inc. ("C&D") has been designing and producing batteries at the Attica, Indiana facility for many decades.  For more than forty years, collective bargaining between C&D and the local union has resulted in employees being granted 5 minutes at the beginning of their shifts to change clothes and get to their work stations and 10 minutes before quitting time to wash-up and shower.  (Factual Stipulation 3.)  In October of 2011, Plaintiffs filed a class action arguing the bargain between C&D and the local union over these activities — in place for over forty years — violates the Fair Labor Standards Act ("FLSA").  However, C&D maintains Sections 203(o) and 254 of the FLSA allow C&D and the local union to negotiate over the compensability of these pre- and postshift activities.  As a result, C&D is requesting the Court grant C&D's Partial Motion for Summary Judgment.

The earliest agreement known to exist between C&D and a local union[2] was entered into on July 31, 1967.  (Factual Stipulations, Exhibit B.)  The 1967 Collective Bargaining Agreement ("CBA") between C&D and the union included Article XVIII, which granted employees 5 minutes at the beginning of their shift to change into work clothes and be at their work stations, and 10 minutes before quitting time to wash-up and shower.  (Factual Stipulation 3.)  Article 18, Health and Safety, Section B states:

---

[1] Since the parties have stipulated to material facts in support of their cross partial motions for summary judgment [Docket Entry 78], Defendant is not filing a statement of disputed facts.

[2] An earlier agreement may exist but neither the union nor C&D have located an earlier one.  In 1967, the local union was represented by the International Union of Electrical, Radio and Machine Workers.  (*See* Factual Stipulations, Exhibit B.)  Over the years, the name of the international union representing the local union has changed.  The current CBA in effect was negotiated by the International Union of Electronic, Electrical Salaried, Machine and Furniture Workers.  (*See* Factual Stipulations, Exhibit A.)

> To ensure and safeguard the health and safety of all employees the company has installed and maintains certain protective facilities and provides time for their use. An allowance time of five minutes (5) is provided between the start of the shift and the time an employee must be at his workstation for changing into acid resistant or dustproof clothing.  In addition, a wash up (sic) allowance time of five minutes before lunch and ten minutes wash up and shower period before quitting time is given to all employees.  The allowances for changing clothes, wash up, shower and rest period must be observed for the purposes for which they are established.

(*Id*.)  This article has remained substantively identical throughout numerous collective bargaining agreements from 1967 to the present.  (*Id*.)  No bargaining notes or records have been located related to this article.  (*Id*.)

C&D employees participate in a predictable routine before and after working on batteries each day.  When they first arrive at the facility, employees punch a yellow time card.  (Factual Stipulation 5.)  Employees then head to the locker room to change clothes.  (Factual Stipulation 9.)  Next, employees who wear respirators or safety helmets collect their equipment.  (*Id*.)  Then, employees head to their work station, punch their white time card, and begin production work. (*Id*.)  Ten minutes before the end of their shifts, employees punch out at the white time card, return any equipment they may have used, if dusty, vacuum their clothing and head to the locker room to change and shower.  (Factual Stipulation 10.)  The last thing employees do before leaving the facility is punch out on their yellow time card.  (*Id*.)

C&D pays their employees based on three eight-hour shift schedules.  (Factual Stipulation 6.)  The starting and quitting times of these shifts are as follows:  First = 7 a.m. to 3 p.m.; Second = 3 p.m. to 11 p.m.; and Third = 11 p.m. to 7 a.m.  (*Id*.)  The CBA negotiated between C&D and the local union requires employees to be paid for the full eight-hour scheduled shift, including breaks and meal time.  (Factual Stipulation 11.)  Pay is not based on the yellow time cards.  (Factual Stipulation 5.)  White time cards are used to establish and

3

calculate incentive pay and special rate activities.  (Factual Stipulation 8.)  C&D does not pay employees for the time punches on the white time card; instead, employees are paid for the entire 8 hour scheduled work shift.  In other words, C&D pays for the additional 15 minutes a day outlined in Article 18, Section B of the CBA for the pre- and postshift activities at issue in this case.  Since 1967, C&D and the local union have agreed employees will be given the 15 minutes of time each day for pre- and postshift activities pursuant to Article 18, Section B of the CBA. (Factual Stipulation 12; Factual Stipulations, Exhibits A and B.)  The custom and practice at C&D has been to pay employees for pre- and postshift activities conducted during the 5 and 10 minute time allowances at the beginning and end of the shift despite no mention of pay or compensation in Article 18, Section B of the CBA.  (Factual Stipulation 12; *see also* Factual Stipulations, Exhibit A.)  Conversely, C&D has not paid employees for pre- and postshift activities if those activities occur outside the 5 and 10 minute time allowances either before or after the shift.  (Factual Stipulation 12)

### III.    LAW AND ARGUMENTS

**A.    The Time that Plaintiffs are Seeking Compensation For is Barred by Operation of Longstanding CBA Language and Past Practice Between the Company and the Union Pursuant to 203(o) and 254 of the FLSA**

**1.    Where a Union Exists, Congress Authorized Bargaining Over the Activities At Issue in this Case**

As the recent decision in *Sandifer* v. *U.S. Steel* makes clear, Congress amended the Portal-to-Portal Act and added 203(o) and 254 to allow a company and union to bargain over pre- and postshift activities such as donning and doffing clothing, washing and travel time to and from work areas.  As the *Sandifer* court noted "it was concern with the disruption of the workplace caused by forcing employers to compensate for travel time and clothes changing

4

time…that drove the enactment of Sections 203(o) and 254(a)." *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 597 (7th Cir. 2012) (internal citations omitted).

In passing these provisions the Seventh Circuit noted that "Congress was trying to eliminate the disruptions that the court's interpretation of the Fair Labor Standards Act had caused, and to allow the determination of what is compensable work in borderline cases . . . to be settled by negotiations between labor and management." *Id.* at 597–98. To demonstrate Congress' intent, the Seventh Circuit cited the preamble to the Portal-to-Portal Act at length:

> The Congress finds that the Fair Labor Standards Act of 1938 . . . has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital recourses of many others, thereby resulting in the reduction of industrial operations, halting of expansion and development, curtailing employment, and the earning power of employees; (2) the credit of many employers would be seriously impaired; (3) there would be created both an extended and continuous uncertainty on the part of industry, both employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in; [and] (6) voluntary collective bargaining would be interfered with and industrial disputes between employees and employers and between employees and employees would be created . . . .

*Id.* at 598 (citing 29 U.S.C. § 251(a)).

It is clear from this that Congress wanted to empower the company and union to bargain over pre- and post-shift activities such as those in 203(o) and 254, rather than having those activities subjected to litigation in court. It did so in an effort to preserve industrial labor peace

5

and stability where unions existed to adequately protect employees' interests in collective bargaining.

### 2.      203(o) and 254 Allow Bargaining Over All of the Activities at Issue Here

Clearly, 203(o) expressly identifies the donning and doffing of clothes and washing to be activities subject to bargaining.  29 U.S.C. § 203(o) (2010).  Furthermore, 254(b) and (c) state that pre- and post-shift activities that come before or after principal work activities can be bargained.  Section 254(b) states that even if an activity would otherwise be non-compensable under subpart (a), an employer and union can nonetheless agree to compensation for such activities through "an express provision of . . . contract . . . or a custom or practice . . . ."  29 U.S.C. § 254(b).  These activities have traditionally included any walking time or other travel time, but can also include other incidental activities such as picking up respirators and dropping respirators off and the vacuuming of clothes.[3]  All of these activities occur either prior to or after the making of batteries, which is the principal work activity at this employer.  None of the activities for which the plaintiffs are asking compensation involve the core production work of actually creating, making or otherwise working with batteries.  These are all activities that occur either at the beginning or the end of the shift that are appurtenant to this actual core work.

### 3.      Collective Bargaining Agreement Language at Issue Here Combines 203(o) and 254 Activities

Sections 203(o) and 254 allow a union and a company to combine these activities in bargaining with a single or in this case two sets of time, one at the beginning and one at the end

---

[3] Section 254 excludes from compensation numerous pre- and post-shift activities, for example:  waiting to don protective gear, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 42 (2005); carrying a briefcase, *Singh v. City of New York*, 418 F. Supp. 2d 390, 399 (S.D.N.Y. 2005), *aff'd*, 524 F.3d 361 (2d Cir. 2008); polishing shoes, boots and duty belts, cleaning radios and traffic vests, and oiling handcuffs, *Musticchi v. City of Little Rock, Ark.*, 734 F. Supp. 2d 621, 630–32 (E.D. Ark. 2010); and waiting in line to receive a paycheck, 29 C.F.R. § 790.7.

of the shift.[4]  In other words there is nothing in 203(o) or 254 that requires the company and the

union to separately bargain over 203(o) and 254 activities or split out one activity from another

for purposes of compensation.  Furthermore, the Code Federal Regulations suggests that

donning, doffing, and washing time can be bargained over in conjunction with other pre- and

postliminary activities of 254 in certain circumstances.  29 C.F.R. § 785.26 (2011). ("The same

would be true if the changing of clothes or washing was a preliminary or postliminary activity

compensable by contract, custom, or practice as provided by section 4 of the Portal-to-Portal

Act, and as discussed in § 785.9 and Part 790 of this chapter.").  In so doing, the regulations

foreshadow an agreement between an employer and union where donning, doffing, washing, and

walking time as well as other pre- and postliminary activities are bargained over as a whole.  *Id*.

C&D's Collective Bargaining Agreement and practice is such an agreement.  It

encompassed not only donning, doffing, and washing time but also travel time and the other

activities at issue here.  The labor agreement language that has remained substantively

unchanged for at least 45 years states:

> To ensure and safeguard the health and safety of all employees the company has
> installed and maintains certain protective facilities and provides time for their use.
> An allowance time of 5 minutes is provided between the start of the shift and the
> time and (sic) employee **must be at his work station** to change into acid-resistant
> or dustproof clothing.

Factual Stipulations, Exhibit A (Art. 18 § B) (emphasis added).

The time allowances at the beginning and end of the shift incorporate within them the

concept of getting to and from the work stations.  Why else would the language "must be at his

---

[4] It is also highly practical for a company and a union to combine these 254 and 203(o) activities at the bargaining table.  These activities are appurtenant to one another.  All happen at the beginning or end of the shift.  Further, requiring a company and union to bargain separately over each finite activity would lead to absurd results.  Some of the activities at issue may take no more than a minute or two at most.  Expecting a company and a union to parse out a minute for picking up a respirator, two minutes for walking to and from a work area, etc., and policing such tiny blocks of time would create headaches for employers and unions and frustrate Congress' intent in granting these bargaining rights in the first place.

work station" be used in the CBA?  This is a clear and unequivocal reference to the fact that part

and parcel of what employees needed to accomplish during the 5 minutes at the start of the shift

and 10 minutes at the end of the shift, was getting themselves to their work stations and getting

from their work stations back up to the changing area and completing any other incidental

activities that they need to engage in during that time.  Furthermore, the very first sentence of

this section talks about the installation of "protective facilities" for employees' use.  This

language implies that employees are to avail themselves of these protective facilities during the

time allotments they are given.  These protective facilities include the wash area, the locker area,

the vacuums and respirator storage area.

      The practice of the parties underscores that these activities were all expected to be

engaged in during the 5 and 10 minute time allowances afforded under the labor agreement.  As

noted in the stipulated facts, the very last activity at the beginning of the shift that employees

perform is walking out to their workstation.  (Factual Stipulation 9.)  Just prior to that they

would, if necessary, obtain a respirator from the respirator area.  (*Id.*)  Likewise at the backend of

the shift, the very first thing employees do within that 10 minute time allowance is leave their

workstation and travel back up to the wash up and locker room area.  (Factual Stipulation 10.)  In

that time frame they might also, if necessary, vacuum clothing or drop off a respirator.  (*Id.*)  The

last activity they perform at the end of the day is the washing and the changing of clothes.  (*Id.*)

While the language in the CBA does talk about the 5 and 10 minute timeframes being allotted for

the purpose of changing clothes and washing up, the practice has included all of these 254

activities within the time allowances.  Based on custom and practice the non-203(o) activities are

occurring within the 5 and 10 minute time allotment periods closer in time to the core work

activity of making batteries than the actual donning, doffing and washing activities.  Thus, in

8

practice, employees are more likely to be engaged in 254 activities during these allowances than 203(o) activities.

   **4.   Contrary to Plaintiffs' Allegations, 203(o) and 254 Allow the Bargain that has Been Struck Here of Compensating for Some but Not All of the Time Spent in These Activities**

Plaintiffs argue that 203(o) mandates an all or nothing end result to bargaining.  That either the company and the union must agree to exclude from measured working time all of the time spent changing clothes and washing up or none of it.  (Pls. Br. 20.)  Plaintiffs' argue for a very narrow reading of 203(o) that does not comport with either the intent of Congress in passing 203(o) or the language of the provision itself.  As the *Sandifer* court noted, this section is in the definition section of the FLSA and should therefore be given a broad meaning not the narrow one given by the Ninth Circuit in the *Alvarez* case.  *Sandifer*, 678 F.3d at 595.  Section 203(o) states:  "There shall be excluded any time spent in changing clothes or washing . . . which was excluded from measured working time . . . by the express terms of or by custom or practice under a bona fide Collective Bargaining Agreement . . . ."  29 U.S.C. § 203(o).

Importantly, had Congress intended to mandate that the bargaining over this activity be an all or nothing end result, it could have changed the words "any time" to "all time."  Congress could also have added a sentence stating something like:  "In all cases, the agreement reached must include all time spent in these activities or none of it."  It did neither.  Section 203(o) allows the company and the union to establish *what is measured working time* and bargain over that so long as they are bargaining over the activities outlined in 203(o).  Effectively, this language *does* allow the company and the union to establish the beginning and end of a work day when they are negotiating over these activities.  Here, the company and the union carved out 15 minutes a day for these activities, but no more.

9

Furthermore, 254 also points to the conclusion that Congress meant to allow companies and unions to bargain a compromise position rather than an all or nothing end result to bargaining over these activities.  254(c) in particular states:

> "(c) <u>Restriction on Activities Compensable Under Contract or Custom</u>
>
> For the purposes of subsection (b) of this section an activity shall be considered as compensable under such contract provision or such custom or practice <u>only when it is engaged in during the portion of the day with respect to which it is so made compensable</u>."

29 U.S.C. § 254(c) (emphasis added).

The language in 254(c) thus contemplates the very agreement that the parties have here. If an employee engages in these activities during the 5 and 10 minute time allotments, he is compensated.  But if he engages in those activities outside those timeframes he is not paid for those activities.

If 254(c) were not clear enough, 254(d) crystalizes the point that unions and companies can reach agreements agreeing to pay for only *part* of the time spent in these pre- and postshift activities.  It states:

> "(d) Determination of time employed with respect to activities
>
> In the application of the minimum wage and overtime compensation provisions of the FLSA . . . in determining the time for which an employer employs an employee with respect to walking, riding, traveling, or other preliminary or postliminary activities described in subsection (a) of this section, there shall be counted all that time, **but only that time**, during which the employee engages in any such activity which is compensable within the meaning of subsections (b) & (c) of this section."

29 U.S.C. § 254(d) (emphasis added).  The applicable Code of Federal Regulation Section further emphasizes the ability of unions and companies to agree to "payment for all **or a part of** [254 activities] . . . which [are] so made compensable."  29 C.F.R. § 790.5(b) (emphasis added). The regulation uses an example of underground miners to drive home the point:

10

> And under the provisions of section 4(c) of the Portal Act, if a contract, custom, or practice of the kind described makes such travel compensable only during the portion of the day before the miners arrive at the working face and not during the portion of the day when they return from the working face to the portal of the mine, the only time spent in such travel which the employer is required to count as hours worked will be the time spent in traveling from the portal to the working face at the beginning of the workday.

*Id*.

The bargain struck here reflects a compromise that provides benefits to both the employees and C&D that should not be disturbed by the Court.  It rewards employees with some compensation for time spent in engaging in these activities, but also encourages efficient time management for these activities.  For example, if it takes an employee a full 10 minutes to walk from their work area, turn in their respirator and vacuum their clothes before getting to the wash area, that employee effectively does not receive compensation that day for washing up and changing their clothes.  Such a result is neither unfair nor contrary to the dictates of 203(o) and 254.  This contract language and practice of the parties rewards efficient behavior by employees engaging in these pre- and postshift activities, but allows less efficient employees the luxury of taking their time with the caveat that they receive no compensation beyond the 15 minutes a day for these activities.  This bargaining result has the benefits of providing employees some compensation for these activities — 15 minutes a day — and cost stability for the employer who can effectively budget the 15 minutes a day of pay into its labor costs.  This is exactly the sort of result that Congress was looking for in its passage of 203(o) and 254.

### 5.      C&D Does Not Need Express Language Under 203(o) and 254 Excluding These Activities from Measured Working Time

Contrary to Plaintiffs' contentions in their memo in support of partial summary judgment, neither 203(o) nor 254 require the court to consider only express Collective Bargaining Agreement language to the exclusion of custom or practice.  (Pls.' Br. 2, 14, 16.)  Such a reading

11

is neither consistent with courts' interpretation of the term "or" nor is it supported by Supreme

Court precedent discussing labor agreements.  As noted by the Supreme Court in the

Steelworkers trilogy, "the labor arbitrator's force of law is not confined to the express provisions

of the contract, as industrial common law — the practices of the industry in the shop — is

equally a part of the Collective Bargaining Agreement although not expressed in it."

*Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  Furthermore,

arbitrators who have been tasked with interpreting labor agreements have long recognized that

custom and practice often must be referred to in analyzing and giving meaning to the words on

the page of a Collective Bargaining Agreement.

> A union-management contract is far more than words on paper.  It is also all oral
> understandings, interpretations and mutually acceptable habits of action which
> have grown up around it over the course of time.  Stable and peaceful relations
> between the parties depend upon the development of a mutually satisfactory
> superstructure of understanding which gives operating significance and
> practicality to the purely legal wording of the written contract.  Peaceful relations
> depend, further, upon both parties faithfully living up to their mutual
> commitments as embodied not only in the actual contract itself but also in the
> modes of action which have become an integral part of it.

*Coca-Cola Bottling Co.*, 9 LA 197, 198 (1947) (Jacobs, Arb.), cited in Elkouri & Elkouri, How

Arbitration Works, p. 606 (6th Ed.).

Similarly, when courts assess whether a hostile environment exists under Title VII, it

does not confine itself to determining whether the conduct was pervasive or separately consider

whether it was severe.  *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (overruling a district

court decision that sex-based harassment must be repeated, the Seventh Circuit found:  "[T]he

Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based

on the infliction of a hostile working environment exists if the conduct is 'severe or pervasive.'").

Courts can and often do find that both might exist based on the conduct that is analyzed.  *Id.*  The

fact that the standard reads "severe or pervasive" does not prohibit a court from considering both. *Id*.

Here, Plaintiffs themselves must rely on more than the physical words of the labor agreement for their arguments. The Court should take notice that nothing in Article 18, Section B says anything about pay, wages or compensation. The language only talks about the allotment of time at the beginning of the shift and the allotment of time at the end of the shift. One must look to the past practice applying this language to reach the conclusion that pay has been issued and granted to employees for these time allotments. Thus, Plaintiffs must rely on something more than the mere confines of the words on the page to give full meaning to the language.

Likewise, my client is entitled to have the Court assess and analyze not only the words on the page, but also the practice that has developed surrounding that language to give it its fullest meaning.

Here, C&D did not need to have specific language in the labor agreement saying "and all other time spent engaging in these activities will be excluded from paid working time." As 203(o) and 254 make clear, it is permissible to have a custom or practice surrounding such an exclusion. The custom in practice here has been that any time spent in these activities outside the **15** minutes a day has not traditionally been paid for by C&D. (Factual Stipulation 12.)

**B.    Adopting Plaintiffs' Argument That if the Company Agrees to Pay for Some Time for Donning, Doffing and Washing under 203(o) it Therefore Agrees to Pay for All the Time Spent Engaged in Those Activities Would Undermine the Very Purpose for which Congress Passed 203(o)**

**1.    Labor Stability Would be Undermined**

As noted above, Congress passed 203(o) and 254 with the intent of promoting labor peace, labor stability and allowing unionized companies to avoid retroactive liability and budget with certainty their cost in these areas by taking the matter to the collective bargaining table and

BDDB01 9413465v1

out of the court system.  Plaintiffs essentially argue that 203(o) requires an end result in bargaining to be an all or nothing proposition — either all becomes compensable or none of it is compensable.  (Pls. Br. 20.)  Plaintiffs' position is that if the company agrees in bargaining to provide any time allowance for donning, doffing and washing clothes then suddenly all of the activities that they are complaining over become wholly compensable to their fullest extent.  This would require employers to take a hard line approach in bargaining, demanding that none of this time be compensable, which even plaintiffs acknowledge is allowable under 203(o).  (*See* Pls.' Br. 21.)  The trouble with this approach is that it increases the likelihood of no agreement being reached as to the compensability of these activities.  It would increase the likelihood therefore of work stoppages, impasse and other labor unrest; the very things Congress was trying to avoid in passing 203(o) and 254.

Furthermore, Plaintiffs' proposed reading of 203(o) as requiring an all or nothing end result is contrary to the very essence of bargaining.  Bargaining is a give and take.  It involves compromise — each party shifting positions over the course of labor negotiations and ultimately reaching some middle ground.  *Chicago Casket Co.*, 21 NLRB 235, 251 (1940) ("Collective bargaining, as contemplated by the Act, means more than an idle exchange of proposals.  It means that the employer and the Union shall earnestly and sincerely consider the proposals each has advanced with the end in view of reaching a middle ground upon which both agree.").  This is exactly the end result that occurred here.  The company and the union agreed that 15 minutes a day would be allotted for engaging in these activities.  To the extent employees took longer for these activities, they were not compensated.  While there is no express language in the Collective Bargaining Agreement stating that final point, it is clearly the practice that exists between the parties.

14

2.     **Plaintiffs and Other Employees Ultimately Would not Benefit From A Ruling Granting Plaintiffs' Retroactive Compensation For These Activities**

If employees in the instant case ultimately receive a retroactive windfall as a result of a ruling against C&D, C&D would be forced to go to the bargaining table with a hard line position rendering none of it compensable or seek other concessions in bargaining to offset the previously unanticipated labor costs associated with such a ruling.  The *Sandifer* court took note of this as a likely result in any case where the court disturbed the fruits of the previous bargain.  *Sandifer*, 678 F.3d at 597.

In this case, C&D would need to renegotiate this language that has been in place for more than two generations to state that none of the donning and doffing or washing time would be compensable and that employees would no longer receive their 15 minutes of paid time a day for such activities.  C&D would be forced to do this because of shower creep.  Employees would be incentivized to take as long as possible engaging in these pre- and post-shift activities such as donning and doffing and showering, secure in the knowledge that for the term of the current labor agreement they would receive additional pay, including overtime pay, for these activities.[5] In this environment, resentment could arise between employees who take quick showers and those who do not, creating the very tension by and between employees that Congress was concerned about in the preamble to the Portal-to-Portal Act ("industrial disputes . . . between employees and employees would be created . . . .").  29 U.S.C. § 251(a).  Furthermore, C&D would be hard pressed to control the amount of time employees spent engaged in these activities.  Certainly, C&D cannot set up video cameras in the shower area or locker rooms.  Nor from a safety standpoint could it simply shut off the water at a certain time.  Effectively, C&D would be

---

[5] Under Article 4(B) of the Labor Agreement, C&D agrees to pay overtime for any amounts of time over 8 hours in a day.  This would render time spent in these activities beyond the 15 minutes a day allotted to employees as compensable on an overtime basis.

at the mercy of an ever increasing spiral of incentivized employee inefficiency and nonetheless forced to pay for it.  These spiraling costs would be added into C&D's overhead without C&D being able to effectively produce more product to offset these rising costs since none of these activities involve the actual making of batteries.  Given these factors, C&D would have to go to the bargaining table and demand to cut off any compensation for these activities or other off setting concessions should the Court rule against it.  Long term, employees would end up losing out.

**C.**   **Court Rulings Support C&D's Position in This Case that the Agreement and Past Practice Between the Company and the Union Should Control**

   **1.**   **At Least One Court Has Held that 203(o) Allows for the Type of Agreement at Issue Here**

   Only one court has been located that has addressed an agreement similar to our agreement.  In *Hoover v. Wyandotte Chemical Corporation*, unionized employees at a chlorine plant brought an action to recover overtime pay for additional time spent in connection with changing work clothes and showering at the end of the shift beyond the 15 minutes a day of pay that they received under the existing practice.[6]  455 F.2d 387 (5th Cir.), *cert. denied*, 93 S.Ct. 52 (1972).  In that case, the union had attempted in bargaining to obtain 23 to 25 minutes of pay each day instead of only 15, but was unsuccessful.  *Id*. at 388.  The employees then filed suit under the FLSA alleging that they were nonetheless entitled to the full 23 to 25 minutes a day for time spent in those activities.  *Id*.  The Fifth Circuit in analyzing 203(o) held that the plaintiff had no claim and dismissed the plaintiff's claim reasoning:

---

[6] In *Hoover*, there was no formal language in a labor agreement codifying the 15 minutes a day.  *Hoover*, 455 F.2d at 388.  But the company had paid for 15 minutes in practice.  During bargaining for a new labor agreement, the union sought to increase that amount of time to 23 to 25 minutes of pay each day.  Employees at this plant were required to change clothes because of concerns about possible mercury contamination.  Id. at 387.

> We are somewhat chagrined by plaintiffs' assertion in this case.  First we find it difficult to conclude that the union's abandonment of its 1968 demands for 23 to 25 minutes of pay for clothes changing and showering did not amount to acquiescence in the defendant's longstanding 15 minute policy.  **More importantly, we think judicial approbation of the plaintiffs' position would constitute a holding that what the union fails to achieve through the process of collective bargaining will be delivered to it under the provisions of the Fair Labor Standards Act.**  The defendant in this case has shown a history of its dealings with the plaintiffs' union in exempting from payment any time exceeding 15 minutes in which an employee spends changing clothes and showering.  Furthermore it has been shown that the collective bargaining negotiations between the union and the company encompassed the company's policy concerning payments for such activities.  Against this factual background we consider it a logical interpretation of the Portal-to-Portal Act to conclude that Section 203(o) precludes the plaintiffs from recovering overtime pay for any time exceeding 15 minutes in which the plaintiffs were engaged in changing clothes or showering.

*Id*. at 389 (emphasis added).

While the court in *Hoover* did not analyze actual contract language that also contemplated 254 activities such as travel time, it is fair to assume that the court would have adopted a similar reading for the activities falling under 254.  Especially considering at least one court has upheld — pursuant to 254 — a nonunionized company's policy to pay only a portion of pre- and postliminary travel time, but not all travel time.  *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2009 WL 2612307, at *8 (N.D. Cal. Aug. 24, 2009).  Additionally, *certiari* was sought to the Supreme Court in the *Hoover* case, but it was denied.  *Hoover v. Wyandotte Chem. Corp.*, 93 S.Ct. 52 (1972).  While this case is certainly not new, its analysis and end result are correct.  As the court in *Hoover* noted:  "While the Fair Labor Standards Act does have an important remedial scope and function . . . [it] is not limitless."  *Hoover*, 455 F.2d at 389.

Importantly, the court recognized that 203(o) allows a company and a union to reach a compromise agreement.  It upheld the notion that some amount of time could be negotiated as compensable under 203(o) for changing and donning and doffing, but not all of the time.

17

2.     **Nor Do the Supreme Court Decisions of *Steiner* and *Barrentine* Support the Plaintiffs' Position**

a.     ***Steiner v. Mitchell* and Its Holding are Inapplicable to this Case**

The *Steiner* case did involve a battery manufacturer such as ours and did analyze whether or not clothes changing and washing up time could be compensable under the FLSA. *Steiner v. Mitchell*, 350 U.S. 247, 248 (1956). But *Steiner* did not involve contract language or a practice between the company and the union whereby some or all of that clothes changing and washing time were rendered non-compensable under 203(o). In fact, the only reference the *Steiner* court makes to 203(o) is to support the government's argument that there are circumstances under which clothes changing and washing up can be compensable time — otherwise why have 203(o) in existence? *Id*. at 254–55. The *Steiner* court stated, "[i]n 1949, Section 203(o) was added to the Act. Both sides apparently take comfort from it, but the position of the government is strengthened by it since its clear implication is that clothes changing and washing which are otherwise a part of the principal activity may be expressly excluded from coverage by agreement." *Id*. The *Steiner* court found that Congress in passing 203(o) recognized that there were industries or situations in which the chemicals or other factors in the working environment required the changing of clothes and the washing up rendering it normally compensable unless excluded under 203(o). *Id*.

b.     **The *Barrentine* Case Does Not Support Plaintiffs' Position Either**

In *Barrentine v. Arkansas Best Freight System, Inc.*, the Supreme Court was struggling with the question of whether employees, after unsuccessfully submitting a wage claim through a grievance arbitration process could then bring the wage claim into court under the FLSA. 450 U.S. 728, 729–30 (1981). The uncompensated work at issue did not involve 203(o) or 254 activities, but rather time spent by truck drivers conducting safety inspections of trucks and

18

transporting trucks to repair facilities.  *Id.* at 730–31.  In reaching its decision, Justice Brennan, writing for the court, ruled that there are inviolate areas of FLSA that can be brought to protect employees' minimum guarantees under the Act and cannot be abrogated by operation of a labor agreement.  *Id.* at 739–40.  In particular, Justice Brennan stated that, "The Fair Labor Standards Act was not designed to codify or perpetuate [industry] customs and contracts . . . .  Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act.  Any custom or contract language falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."[7]  *Id.* at 741 (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602–03 (1944)).

But Justice Brennan noted in his footnote immediately following this quote that the FLSA <u>does</u> contain numerous references to Collective Bargaining Agreements excepting certain work from compensation under the operation of a Collective Bargaining Agreement.  *Id.* n.19. In particular, Justice Brennan cited to 203(o) and 254 along with other provisions.  *Id.*  Justice Brennan explained, "Where plaintiff's claim depends upon application of one of these exceptions, we assume without deciding that a court should defer to a prior arbitral decision construing the relevant provisions of the Collective Bargaining Agreement.  In this case, however, petitioner's threshold does not depend upon application of any of those exceptions." *Id.*

As even Justice Brennan noted and recognized, 203(o) and 254 allow company and the union to bargain collectively over these activities that are at issue in our case.  They allow them

---

[7] Here there is no issue of any employee falling below minimum wage even if a full 30 minutes a day were added to their working time.  Under the Collective Bargaining Agreement the lowest starting pay rate is $10.47/hr.  (Exhibit

to bargain to the point of rendering none of the activities compensable.  Unlike the petitioners in *Barrentine*, the activities at issue here are squarely within the confines of 203(o) and 254. Unlike the petitioners in *Barrentine*, C&D and the union bargained over these activities and codified an agreement with respect to these activities in the labor agreement.  As Justice Brennan noted, the results of that bargain ought to be honored by the court.  Ruling in C&D's favor would not contravene *Barrentine*, but rather complement it as recognition that yes, Congress did authorize C&D and the union to bargain over certain borderline activities such as those at issue here.

### 3. *Alvarez* and *Sandifer* Do Not Help Plaintiffs

Neither the Supreme Court's decision in *Alvarez* nor *Sandifer* help Plaintiffs in this case. Both *Alvarez* and *Sandifer* involved contract language or custom or practice whereby the company and the union agreed <u>not to pay for 203(o) activity at all</u>.  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 30–31 (2005); *Sandifer*, 678 F.3d at 591–92.  Further, neither of these cases involve contract language that combined 254 activities such as travel time with 203(o) activities such as ours does here.

The Supreme Court's ruling in *Alvarez* was quite narrow as IBP did not appeal the Ninth Circuit's decision that the items being donned and doffed did not constitute clothes within the meaning of 203(o).  *Alvarez*, 546 U.S. at 24, 30.  The company's failure to appeal this part of the Ninth Circuit's decision left the Supreme Court with its hands tied.  It was forced to conclude that the walking time following the un-appealed, now compensable clothes changing time was part of the continuous work day and thus not excludable under 254(a).  *Id*. at 30.  Nor was there any evidence in *Alvarez* of any bargaining or agreement with respect to the travel time.  *Id*. at 30–42.  Likewise, the *Sandifer* court contains no evidence of any agreement with respect to the

A at p. 26).  ).

travel time and neither case involved contract language of custom or practice whereby employees received some compensation for 203(o) and 254 activities rather than no compensation at all.  *Sandifer*, 678 F.3d at 591–92.  What Plaintiffs are seeking here is an expansion of the *Alvarez* decision and the *Sandifer* decision to state that where the parties as here have bargained over these 203(o) and 254 activities and agreed to pay for some period of time spent in these activities that they are now somehow mandated to pay for all of the time spent in these activities.

### 4.      Plaintiffs' Reliance in the *Helmert v. Butterball* is Misplaced

Plaintiffs spent considerable time describing the Eastern District of Arkansas' rejection of *Butterball's* argument that it could unilaterally establish "plug time" for donning and doffing activities.  But the *Butterball* plant at issue was nonunion.  *See generally Helmert v. Butterball, LLC*, 805 F. Supp. 2d 655 (E.D. Ark. 2011).  The employer in *Butterball* kept arguing that it could unilaterally implement a handbook provision that provided this plug time and cited to a Department of Labor Field Operations Handbook for support.  *Id*. at 665–66.  But the court in *Butterball* appropriately found this reliance misplaced as that Field Handbook was referring to 203(o) situations where a Collective Bargaining Agreement exists.  *Id*.  The *Helmert* court found that where no union exists and no Collective Bargaining Agreement or custom or practice exists with a bona fide union, employers may not unilaterally impose a plug time arrangement in its handbook.  That is not the fact situation that exists here.  To the contrary, the only court, as we have pointed out, that has considered whether an employer — in bargaining with the union — can agree to pay a reasonable amount of time for 203(o) activities and exclude any remaining time is the Fifth Circuit in the *Hoover v. Wyandotte Chemical* case cited above.  For these reasons, the *Butterball* case is irrelevant for purposes of this case analysis.

5. *Leahy* and *Tennessee Coal* **Also Do Not Support Plaintiffs' Position**

Plaintiffs' reliance on *Leahy v. City of Chicago*, 96 F.3d 228 (7th Cir. 1996) and

*Tennessee Coal, Iron & Railway Company v. Muscoda Local No. 123*, 321 U.S. 5903 (1944) is

misguided.  First, the Seventh Circuit in *Leahy* did not address activities contained in Section

203(o) or 254 of the FLSA.  Rather, *Leahy* dealt with police officers who sought compensation

for half-hour meal periods that were rendered non-compensable under a governing Collective

Bargaining Agreement.  *Leahy*, 96 F.3d at 231–32.  C&D recognizes that it cannot simply

bargain away many rights under the FLSA.  However, C&D contends it can bargain over pre-

and posts-hift activities outlined in 203(o) and 254.  Certainly there is no dispute over meal

breaks in this case.  As stipulated, C&D pays employees for all the time spent during their work

shift, including lunches and other breaks.  (Factual Stipulation 11).

Plaintiffs also rely heavily on the portion of *Leahy* that comes from Judge Cuhady's

dissenting opinion, not the majority.  *Compare* Pls.' Br. 27–28 *with Leahy*, 96 F.3d at 234.  As

such, the dissent is not part of the controlling reasoning in the case.  Rather, more instructive is

the majority opinion in *Leahy*, which states:  "Employers and employees may make 'reasonable

provisions of contracts [to guide] the computation of work hours where precisely accurate

computation is difficult or impossible."  *Leahy*, 96 F.3d at 232 (citing *Tennessee Coal*, 321 US at

603).  Thus the majority opinion alludes to precisely the pre- and post-shift activities that are

statutorily bargainable under Sections 203(o) and 254, which are at issue in this case.

*Tennessee Coal* itself is also distinguishable because there is no discussion in that case of

pre- and post-shift activities under Sections 203(o) and 254.  The reason for this is simply

because *Tennessee Coal* was decided *before* Congress passed Sections 203(o) and 254.

Regardless, *Tennessee Coal's* holding remains inapplicable to the case at bar.  It merely stands

for the proposition that employers and employees cannot contract around FLSA rights as they relate to principal work activities. *Tennessee Coal*, 321 US at 602–03. In that case the Supreme Court gave the classic example of an employer and employee agreeing to pay that is less than minimum wage. *Id.* However, no such deal was made here. Here C&D and the union agreed to partial compensation of pre-shift and post-shift activities contemplated and allowed under 203(o) and 254. Without discussion of the main issue here — the application of 203(o) and 254 — *Leahy* and *Tennessee Coal* provide no guidance to the Court when addressing the issue at hand.

### 6.      C&D Has Not Violated Any Recordkeeping Obligations

Under the FLSA, employers must, "maintain and preserve payroll or other records . . . hours worked each work day and total hours worked each work week . . . ." 29 C.F.R. § 516.2. Here, it is undisputed that C&D does keep track of production work via the use of the white timecards which must be punched by employees no later than 5 minutes after the start of their shift and 10 minutes before the end of their shift. (Factual Stipulation 8.) C&D then pays employees for the additional 5 and 10 minute timeframes allotted for these pre-and postshift 203(o) and 254 activities as agreed to in Article 18, Section B, and which is the past practice. The only definition of hours worked under the FLSA *is* Section 203(o) which allows for the exclusion of time spent engaging in the changing of clothes and washing up at issue in this case. As stated earlier, 203(o) allows a company and a union to establish what is *measured working time* for purposes of the meaning of "hours worked" under 203(o). Here they have agreed that 15 minutes a day will be added to measured working time for these activities and anything beyond the 15 minutes a day is excluded from measured working time for these activities. In all, should the court find that the bargain struck between the company and the union here is valid and

enforceable, then C&D's method of tracking working time through white timecards coupled with the 15 minute time allowance of each day is likewise perfectly appropriate.

## IV.   CONCLUSION

For above reasons, C&D asks this Court to uphold its contractual agreement with the Union by granting C&D's Partial Motion for Summary Judgment and denying Plaintiffs' Motion.

Respectfully submitted,

FAEGRE BAKER DANIELS LLP

s/Martha M. Lemert
Martha M. Lemert (#20961-02)
111 E. Wayne Street, Suite 800
Fort Wayne, IN  46802
Phone:  260-424-8000
Fax:      260-460-1700
Email:  martha.lemert@FaegreBD.com

Tareen Zafrullah (#25892-49)
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Phone:  317-237-0300
Fax:      317-237-1000
Email:  tareen.zafrullah@FaegreBD.com

Samuel K. Conrad (#30304-01)
111 E. Wayne Street, Suite 800
Fort Wayne, IN  46802
Phone:  260-424-8000
Fax:      260-460-1700
Email:  samuel.conrad@FaegreBD.com

ATTORNEYS FOR DEFENDANT,
C&D TECHNOLOGIES, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Robert Peter Kondras, Jr.
Hunt Hassler & Lorenz LLP
100 Cherry Street
Terre Haute, IN  47807

s/Martha M. Lemert